## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | |
|---|---|
| **SYDNEY ROGERS,** | **FIRST AMENDED** |
| **Plaintiff,** | **COMPLAINT AND** |
| | **JURY DEMAND** |
| **v.** | |
| **ETHICON, INC. and JOHNSON &** | **No. 1:20-cv-00107-LO-JFA** |
| **JOHNSON,** | |
| **Defendants.** | |

### FIRST AMENDED CIVIL ACTION COMPLAINT

Plaintiff, SYDNEY ROGERS ("Plaintiff"), by and through her counsel, brings this First Amended Complaint to set forth against Defendants' ETHICON, INC., and JOHNSON & JOHNSON (collectively, "Defendants'", as the context may require) for injuries suffered as a result of the implantation of defective pelvic mesh products designed, manufactured and marketed by Defendants'. In support, Plaintiff states and avers as follows:

### PARTIES

1.      Plaintiff Sydney Rogers currently is a citizen and resident of the state of Mississippi. At the time she had the Ethicon device implanted, Plaintiff was a citizen and resident of the Commonwealth of Virginia.

2.      Defendant, Ethicon, Inc. is a wholly owned subsidiary of Defendant Johnson & Johnson incorporated in New Jersey with a principal place of business in in Somerville, New Jersey.

3.      Defendant, Johnson & Johnson is a New Jersey corporation with a principal place of business in New Brunswick, New Jersey.

4.      Defendants ETHICON, INC. and JOHNSON & JOHNSON share many of the same officers, directors and operations; and maintain ownership in the assets and/or liabilities relating to the design, manufacture, marketing, distribution and sale of the medical device line at issue in this litigation and shall be referenced collectively hereinafter as "Defendants".

5.      All acts and omissions of each Defendant as described herein were done by its agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership.

## .JURISDICTIONAND VENUE

6.      Damages sought in this matter are in excess of $75,000.00. Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332.

7.      This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.      Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to this claim occurred in this district which Plaintiff was implanted with and subsequently injured by Defendants' Gynecare TVT-O ("Gynecare TVT" or "Product") in Virginia.

9. Defendants conducted substantial business in the Commonwealth of Virginia and in this District, distribute Pelvic Mesh Products in this District, receive substantial compensation and profits from sales of Pelvic Mesh Products in this District, and made material omissions and misrepresentations and breaches of warranties in this District so as to subject them to *in personam* jurisdiction in this District.

10. Defendants conducted business in the Commonwealth of Virginia through sales representatives conducting business in the State of Virginia and because Defendants were engaged in

testing, developing, manufacturing, labeling, marketing, distributing, promotion and/or selling, either directly or indirectly, and/or through third parties or related entities, Pelvic Mesh Products; thus, there exists a sufficient nexus between Defendant forum contacts and the Plaintiff's claims to justify assertion of jurisdiction in Virginia.

11.    Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has *in personam* jurisdiction over Defendants, because Defendants are present in the Commonwealth of Virginia such that requiring an appearance does not offend traditional notices of fair play and substantial justice.

## II.    DEFENDANTS' PELVIC MESH PRODUCTS

12.    In or about October, 2002, the Defendants began to market and sell a product known as Gynemesh, for the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence. All references to Gynemesh include all variations of or names used for Gynemesh, including but not limited to Gynemesh PS.

13.    Gynemesh was derived from a product known as Prolene Mesh, which was used in the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence. Prolene Mesh was derived from Defendants' prolene mesh hernia product, and was and is utilized in the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence.  All references to Prolene Mesh include all variations of Prolene Mesh, including but not limited to Prolene Soft Mesh.

14.    In or about September, 2005, the Defendants began to market and sell a product known as Prolift, for the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence. The Prolift was and is offered as an anterior, posterior, or total repair system, and all references to the Prolift include by reference all variations.

15.    In or about May, 2008, the Defendants began to market and sell a product known

as Prolift+M, for the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence. The Prolift+M was and is offered as an anterior, posterior, or total repair system, and all references to the Prolift+M include by reference all variations.

16.     The Defendants market and sell a product known as TVT, for the treatment of stress urinary incontinence in females. The TVT has been and is offered in multiple variations including, but not limited to, the TVT, TVT-O, and TVT-S, and all references to the TVT include by reference all variations.

17.     The products known as Prolene Mesh, Gynemesh,, Prolift, Prolift+M, and TVT, as well as any as yet unidentified pelvic mesh products designed and sold for similar purposes, inclusive of the instruments and procedures for implantation, are collectively referenced herein as Defendants' Pelvic Mesh Products or the Pelvic Mesh Products.

18.     Defendants' Pelvic Mesh Products were designed, patented, manufactured, labeled, marketed, and sold and distributed by the Defendants, at all times relevant herein.

## FACTUAL BACKGROUND

19.     On November 16, 2010, Plaintiff was implanted with an Ethicon/Johnson& Johnson TVT-O, Lot No. 3413157, Cat. No. 810081L ("Pelvic Mesh Products", "Pelvic Mesh Product", and/or "Product") during surgery performed at Virginia Urology Surgery Center in Richmond, Virginia.

20.     The Pelvic Mesh Products were implanted in Plaintiff to treat her urinary incontinence, the use for which the Pelvic Mesh Products were designed, marketed and sold.

21.     On September 11, 2017, Plaintiff underwent revision surgery of the Ethicon/Johnson & Johnson TVT-O product at Mississippi Baptist Medical Center in Jackson, Mississippi.

22.    As a result of having the Product implanted in her, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury and permanent and substantial physical deformity and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses.

23.    Defendants' Pelvic Mesh Product has been and continues to be marketed to the medical community and to patients as a safe, effective, reliable, medical device; implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, primarily pelvic organ prolapse and stress urinary incontinence, and as safer and more effective as compared to the traditional products and procedures for treatment, and other competing pelvic mesh products.

24.    The Defendants have marketed and sold the Defendants' Pelvic Mesh Product to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to direct to consumer advertising, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and include the provision of valuable consideration and benefits to health care providers. Also utilized are documents, brochures, websites, and telephone information lines, offering exaggerated and misleading expectations as to the safety and utility of the Defendants' Pelvic Mesh Product.

25.    Contrary to the Defendants' representations and marketing to the medical community and to the patients themselves, the Defendants' Pelvic Mesh Product has high failure, injury, and complication rates, fails to perform as intended, requires frequent and often debilitating re-operations, and has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including the Plaintiff.

26.    The Defendants have consistently underreported and withheld information about

the propensity of Defendants' Pelvic Mesh Product to fail and cause injury and complications, and have misrepresented the efficacy and safety of the Product, through various means and media, actively and intentionally misleading the FDA, the medical community, patients, and the public at large.

27.    Defendants have known and continue to know that their disclosures to the FDA were and are incomplete and misleading; and that the Defendants' Pelvic Mesh Product was and is causing numerous patients severe injuries and complications. The Defendants suppressed this information, and failed to accurately and completely disseminate or share this and other critical information with the FDA, health care providers, or the patients. As a result, the Defendants actively and intentionally misled and continue to mislead the public, including the medical community, health care providers and patients, into believing that the Defendants' Pelvic Mesh Product was and is safe and effective, leading to the prescription for and implantation of the Pelvic Mesh Product into the Plaintiff.

28.    Defendants failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Defendants' Pelvic Mesh Product.

29.    Defendants failed to design and establish a safe, effective procedure for removal of the Defendants' Pelvic Mesh Product; therefore, in the event of a failure, injury, or complications it is impossible to easily and safely remove the Defendants' Pelvic Mesh Product.

30.    Feasible and suitable alternative designs as well as suitable alternative procedures and instruments for implantation and treatment of stress urinary incontinence, pelvic organ prolapse, and similar other conditions have existed at all times relevant as compared to the Defendants' Pelvic Mesh Product.

31.    The Defendants' Pelvic Mesh Product was at all times utilized and implanted in a manner foreseeable to the Defendants.

32.    The Defendants have at all times provided incomplete, insufficient, and misleading training and information to physicians, in order to increase the number of physicians utilizing the Defendants' Pelvic Mesh Product, and thus increase the sales of the Product, and also leading to the dissemination of inadequate and misleading information to patients, including Plaintiff.

33.    The Pelvic Mesh Product implanted into the Plaintiff was in the same or substantially similar condition as it was when it left the possession of Defendants, and in the condition directed by and expected by the Defendants.

34.    The injuries, conditions, and complications suffered due to Defendants' Pelvic Mesh Product include but are not limited to mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia, blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, pelvic pain, urinary and fecal incontinence, prolapse of organs, and in many cases the women have been forced to undergo intensive medical treatment, including but not limited to operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia, and injuries to Plaintiff's intimate partners.

35.    Despite Defendants' knowledge of these catastrophic injuries, conditions, and complications caused by their Pelvic Mesh Product, the Defendants have, and continue to manufacture, market, and sell the Product, while continuing to fail to adequately warn, label, instruct, and disseminate information with regard to the Defendants' Pelvic Mesh Product, both prior to and after the marketing and sale of the Product.

<u>COUNT I</u>
<u>NEGLIGENCE</u>

36.    Plaintiff realleges and incorporates by reference every allegation of this First Amended Complaint as if each were set forth fully and completely herein.

37.    Defendants had a duty to exercise reasonable and ordinary care in the manufacture, design, labeling, instructions, warnings, sale, marketing, and distribution of the Defendants' Pelvic Mesh Product, and recruitment and training of physicians to implant the Pelvic Mesh Product.

38.    Defendants had a further duty to provide adequate and sufficient instructions concerning the proper use of the Product, as well as warnings of the risks and dangers associated with using the Product, to Plaintiff and to other foreseeable users of the Product

39.    Defendants breached their duty of care and were negligent as described herein the design, manufacture, labeling, warning, instruction, training, selling, marketing, and distribution of the Pelvic Mesh Products in one or more of the following respects:

    a)    Failing to design the Products, so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

    b)    Failing to manufacturer the Product, so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

    c)    Failing to use reasonable care in the testing of the Products, so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

    d)    Failing to use reasonable care in inspecting the Products, so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

    e)    Failing to use reasonable care in training its employees and healthcare providers related to the use of the Products, so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

    f)    Failing to use reasonable care in instructing and/or warning the public, health care providers, and patients, including Plaintiff, as set forth herein of risks associated

with the Products, so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

g) Failing to use reasonable care in marketing and promoting the Products, so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

h) In negligently and carelessly promoting the use of the Pelvic Mesh Products to physicians who had not received sufficient training to master the techniques necessary for the implantation of the device into women, including Plaintiff;

i) Otherwise negligently or carelessly designing, manufacturing, marketing, distributing, warning, labeling, studying, testing, or selling the Pelvic Mesh Products.

j) Defendants failed to design and establish a safe, effective procedure for removal of their Product; therefore, in the event of a failure, injury, or complication, they are impossible to easily and safely remove.

40.    Failed to conduct post-marketing vigilance, or surveillance by:

a) Monitoring or acting on findings in the scientific and medical literature; and

b) Monitoring or investigating and evaluating reports in the FDA adverse event database for their potential significance for Defendants' Pelvic Mesh Products.

41.    Defendants made claims and representations in documents submitted to the FDA, in reports to the public and to healthcare professionals, and in advertisements that the Product did not present serious health risks

42.    Defendants also breached their duty to adequately and sufficiently warn Plaintiff and her healthcare providers and other foreseeable users of the Product's propensity to erode, the rate and manner of mesh erosion, the risk of chronic infections resulting from implantation of the

Product, the risk of vaginal scarring as a result of implantation of the Product, the risk of recurrent severe pelvic pain and other pain resulting from the implantation of the Product, the need for corrective or revisionary surgery to adjust or repair the Product, or the overall severity of complications that could arise as a result of implantation of the Product.

43.     Defendants' Product has been and continues to be marketed to the medical community and to patients as safe, effective, reliable, medical devices implanted by safe and effective minimally invasive surgical techniques for the treatment of medical conditions, primarily POP or SUI, and as safer and more effective as compared to the traditional products and procedures for treatment and other competing pelvic mesh products.

44.     As a proximate result of the Defendants' design, manufacture, labeling, marketing, sale, and distribution of the Pelvic Mesh Product, Plaintiff has been injured, often catastrophically, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT II
## COMMON LAW FRAUD

45.     Plaintiff realleges and incorporates by reference every allegation of this First Amended Complaint as if each were set forth fully and completely herein

46.     The Defendants falsely and fraudulently represented and continue to represent to the medical and healthcare community, the Plaintiff, the FDA, and the public that the Products had been tested and were found to be safe and effective.

47.     The representations made by the Defendants were, in fact, false. When the

Defendants made their representations, the Defendants knew and/or had reason to know that those representations were false, and the Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in their representations and the dangers and health risks to users of the Products.

48.     These representations were made by the Defendants with the intent of defrauding and deceiving the medical community, the Plaintiff, and the public, and also inducing the medical community, the plaintiff, and the public, to recommend, prescribe, dispense, and purchase the Products for use as a means of treatment for stress urinary incontinence and/or prolapse, all of which evinced a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of the Plaintiff.

49.     In representations to the Plaintiff and/or to Plaintiffs healthcare providers, the Defendants fraudulently concealed and intentionally omitted the following material information:

    a.  That the Products were not as safe as other products and procedures available to treat incontinence and/or prolapse;

    b.  That the risk of adverse events with the Products was higher than with other products and procedures available to treat incontinence and/or prolapse;

    c.  The Products were not adequately tested;

    d.  That the limited clinical testing revealed the Products had a higher risk of adverse effects, in addition to, and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

    e.  That the Defendants deliberately failed to follow up on the adverse results from clinical studies and formal and informal reports from physicians and other healthcare providers and buried and/or misrepresented those findings;

    f.  That the Defendants were aware of dangers in the Products in addition to and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

g. That the Products were defective, and that they caused dangerous and adverse side effects, including but not limited to higher incidence of erosion and failure, at a much more significant rate than other products and procedures available to treat incontinence and/or prolapse;

h. That patients needed to be monitored more regularly than usual while using the Products and that in the event the products needed to be removed that the procedures to remove them had a very high failure rate and/or needed to be performed repeatedly;

i. That the Products were manufactured negligently;

j. That the Products were manufactured defectively; and

k. That the Products were designed negligently, and designed defectively.

50. The Defendants' concealment and omissions of material fact concerning the safety of the Products were made purposefully, willfully, wantonly, and/or recklessly to mislead, to cause the Plaintiff's physicians and healthcare providers to purchase, prescribe, and/or dispense the Products; and/or to mislead the Plaintiff into reliance and cause the Plaintiff to use Products.

51. The Defendants were under a duty to disclose to the Plaintiff and her physicians, the defective nature of the Products, including, but not limited to, the heightened risks of erosion, failure, and permanent injury.

52. The Defendants had sole access to material facts concerning the defective nature of the Products and their propensity to cause serious and dangerous side effects and hence, cause dangerous injuries and damage to persons who used the Products.

53. At the time these representations were made by the Defendants, and at the time the Plaintiff used the Products, the Plaintiff was unaware of the falsehood of these representations, and reasonably believed them to be true.

54. The Defendants knew and had reason to know that the Products could and would cause severe and grievous personal injury to the users of the Products, and that they were

inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

55.    In reliance upon these false representations, the Plaintiff was induced to, and did use the Products, thereby sustaining severe and permanent personal injuries and damages.

56.    The Defendants knew or had reason to know that the Plaintiff and her physicians and other healthcare providers had no way to determine the truth behind the Defendants' concealment and omissions, and that these included material omissions of facts surrounding the use of the Products, as described in detail herein.

57.    The Plaintiff reasonably relied on revealed facts which foreseeably and purposefully suppressed and concealed facts that were critical to understanding the real dangers inherent in the use of the Products.

58.    Having knowledge based upon the Defendants' research and testing, or lack thereof, the Defendants blatantly and intentionally distributed false information, including but not limited to assuring the Plaintiff, the public, and Plaintiffs healthcare providers and physicians, that the Products were safe for use as a means of providing relief from stress urinary incontinence and/or prolapse and were as safe or safer than other products and/or procedures available and on the market. As a result of the Defendants' research and testing, or lack thereof, the Defendants intentionally omitted, concealed and suppressed certain results of testing and research to healthcare professionals, the Plaintiff, and the public at large.

59.    The Defendants had a duty when disseminating information to the public to disseminate truthful information; and a parallel duty not to deceive the public, the Plaintiff, Plaintiffs healthcare providers, or the FDA.

60.    The information distributed to the public, the medical community, the FDA, and

the Plaintiff, by the Defendants included, but was not limited to websites, information presented at medical and professional meetings, information disseminated by sales representatives to physicians and other medical care providers, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Products.

61.    The Defendants intentionally made material misrepresentations to the medical community and public, including the Plaintiff, regarding the safety of the Products, specifically that the Products did not have dangerous and/or serious adverse health safety concerns, and that the Products were as safe or safer than other means of treating stress urinary incontinence and/or prolapse.

62.    The Defendants intentionally failed to inform the public, including the Plaintiff, of the high failure rate, including erosion, the difficulty or impossibility of removing the mesh, and the risk of permanent injury. The Defendants chose to over-promote the purported safety, efficacy and benefits of the Products instead.

63.    The Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public, the medical community, and the Plaintiff; to gain the confidence of the public, the medical community, and the Plaintiff; to falsely assure them of the quality and fitness for use of the Products; and induce the Plaintiff, the public and the medical community to request, recommend, prescribe, dispense, purchase, and continue to use the Products.

64.    The Defendants made claims and representations in documents submitted to the FDA and reports to the public and to healthcare professionals and in advertisements that the

Products had innovative beneficial properties and did not present serious health risks. These representations, and others made by the Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

65.    These representations, and others made by the Defendants, were made with the intention of deceiving and defrauding the Plaintiff, the Plaintiffs healthcare professionals and other members of the healthcare community, and were made in order to induce the Plaintiff, and her respective healthcare professionals, to rely on misrepresentations, and caused the Plaintiff to purchase, rely, use, and request the Products and her healthcare professionals to dispense, recommend, or prescribe the Products.

66.    The Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the Products to the public at large, for the purpose of influencing the sales of products known to be dangerous and defective, and/or not as safe as other alternatives.

67.    The Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts and made false representations, for the purpose of deceiving and lulling the Plaintiff, as well as her healthcare professionals, into a false sense of security, so that the Plaintiff and her healthcare providers would rely on the Defendants' representations, and the Plaintiff would request and purchase the Products, and that their healthcare providers would dispense, prescribe, and recommend the Products.

68.    The Defendants utilized direct to consumer advertising to market, promote, and advertise the Products.

69.    At the time the representations were made, the Plaintiff and her healthcare

providers did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the Products. The Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did the Plaintiff discover the false representations of the Defendants, nor would the Plaintiff with reasonable diligence have discovered the true facts or the Defendants' misrepresentations.

70.     Had the Plaintiff known the true facts about the dangers and serious health and/or safety risks of the Products, the Plaintiff would not have purchased, used, or relied on the Products.

71.     The Defendants' wrongful conduct constitutes fraud and deceit, and was committed and perpetrated willfully, wantonly, and/or purposefully on the Plaintiff.

72.     As a proximate result of the Defendants' conduct, Plaintiff has been injured, often catastrophically, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT III
## FRAUDULENT CONCEALMENT

73.     Plaintiff realleges and incorporates by reference every allegation of this First Amended Complaint as if each were set forth fully and completely herein.

74.     Defendants fraudulently concealed from and/or failed to disclose or warn the public, medical providers, and the patients, including Plaintiffs, that their Pelvic Mesh Products were

defective, unsafe, and unfit for the purposes intended, and they were not of merchantable quality.

75.    Further, in representations to Plaintiff and/or to Plaintiff's healthcare providers, Defendants fraudulently concealed and intentionally omitted the statements described herein and below which were material in nature:

a.    . That the Defendants' mesh device was not as safe as other products, treatments and procedures available to treat pelvic organ prolapse;

b.    That the risk of adverse events with the Defendants' device was higher than with other products, treatments and procedures available to treat pelvic organ prolapse;

c.    The Defendants' device was not adequately tested;

d.    That Defendants deliberately failed to follow up on the adverse results from formal and informal reports from physicians and other healthcare providers and buried and/or misrepresented those findings;

e.    That Defendants were aware of dangers in the Defendants' device in addition to and above and beyond those associated with other products, treatments and procedures available to treat pelvic organ prolapse;

f.    That the Defendants' device was defective, and caused dangerous and adverse side effects, including but not limited to higher incidence of erosions, extrusions, adverse tissue response and rejection, contraction, migration, trauma, groin pain, vaginal pain, failure, and revision surgeries at a much more significant rate than other products, treatments and procedures available to treat pelvic organ prolapse;

g.    That patients needed to be monitored more regularly than usual while using the Defendants' device and that in the event the product needed to be attempted to revise or be removed that the procedures to remove segments of the product were

difficult/impossible to remove the mesh, had a very high failure rate and/or needed to be performed repeatedly;

h.   That the Defendants' device was manufactured negligently;

i.   That the Defendants' device was manufactured defectively; and

j.   That the Defendants' device was designed negligently and designed defectively.

76.   Defendants made claims and representations in its promotional materials to healthcare professionals and patients that the Defendants' device had innovative beneficial properties that increased the safety of the device.

77.   The representations made by Defendants were, in fact, false and the omissions were misleading and fraudulent. When Defendants made the representations and omissions, Defendants knew and/or had reason to know that those representations were false, and the omissions were misleading, and Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in the representations and the dangers and health risks to users of the Pelvic Mesh Products, including Plaintiff and her treating physician.

78.   Defendants' concealment and omissions of material facts concerning, inter alia, the safety of the Product was made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiff and Plaintiff's physicians, hospitals and healthcare providers into reliance on the use of the Product, and to cause them to purchase, prescribe, dispense and/or use the products, as well as to cause Plaintiff to have the device implanted in her body.

79.   The information distributed to the public, the medical community, Plaintiff, and her treating physicians by Defendants included, but was not limited to websites, information presented at medical and professional meetings, information disseminated by sales representatives to physicians and other medical care providers, reports, press releases, advertising campaigns,

television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Defendants' device.

80.    Defendants utilized direct-to-consumer advertising to market, promote, and advertise the Defendants' device.

81.    Defendants had sole access to material facts concerning the defective nature of the Pelvic Mesh Products and their propensity to cause serious and dangerous side effects, and hence cause damage to persons who used the Products, including Plaintiff in particular.

82.    At the time these representations and omissions were made by Defendants, and at the time Plaintiff was implanted with the device, Plaintiff and her treating physician were unaware of the falsehood of these representations, misleading nature of omissions and statements, and reasonably believed them to be true. Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff discover the false representations of Defendants, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendants' misrepresentations.

83.    Plaintiff, as well as Plaintiff's physicians, hospitals and healthcare providers, reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendants that were critical to understanding the real dangers inherent in the use of the Pelvic Mesh Products.

84.    In reliance upon these false representations, Plaintiff and her treating physician were induced to, and did use the device, thereby causing Plaintiff to sustain severe personal injuries and damages. Defendants knew or had reason to know that Plaintiff and her treating physician and other healthcare providers had no way to determine the truth behind Defendants' concealment and

omissions, and that these included material omissions of facts surrounding the use of the Defendants' device, as described in detail herein.

85. If Plaintiff, her treating physician, or both would have been made aware of these purposefully suppressed and concealed facts, as set forth herein, Plaintiff would not have used or consented to the implantation of the device and her treating physician would have used the device differently, warned about it differently or not used it at all.

86. Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, Plaintiff and Plaintiff's healthcare providers.

87. Defendants willfully, wantonly, recklessly and/or intentionally represented false, dangerous, and serious health and safety concerns inherent in the use of Defendants' device to the public at large, for the purpose of influencing the sales of products known to be dangerous and defective, and/or not as safe as other alternatives.

88. Defendants chose to over-promote the purported safety, efficacy and benefits of the Defendants' device instead.

89. Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public, the medical community, Plaintiff, and her treating physicians; to gain the confidence of the public, the medical community, Plaintiff, and her treating physicians; to falsely assure them of the quality and fitness for use of the device; and induce Plaintiff, and her treating physician, the public and the medical community to request, recommend, prescribe, dispense, and purchase the Defendants' device.

90. These representations, and others made by Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually

exist and were made recklessly and without regard to the true facts.

91.     Defendants' wrongful conduct constitutes fraud and deceit and was committed and perpetrated willfully, wantonly, and/or purposefully on Plaintiff.

92.     Defendant knew and had reason to know that its device could and would cause severe and grievous personal injury to the patients implanted with the device, and that the device was inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

93.     As a proximate result of the Defendants' conduct, Plaintiff has been injured, often catastrophically, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT IV
## CONSTRUCTIVE FRAUD

94.     Plaintiff realleges and incorporates by reference every allegation of this First Amended Complaint as if each were set forth fully and completely herein.

95.     Defendants are in a unique position of knowledge concerning the quality, safety, and efficacy of the Defendants' Pelvic Mesh Products, which knowledge is not possessed by Plaintiffs or their physicians, and defendants thereby hold a position of superiority over Plaintiffs and their physicians.

96.     Despite their unique and superior knowledge of regarding the defective nature of the Defendants' Pelvic Mesh Products, Defendants continue to suppress, conceal, omit, and/or

misrepresent information to Plaintiffs and the medical community concerning the severity of risks and damages inherent in the intended use of the Defendants' Pelvic Mesh Products, as compared to other products and forms of treatment.

97.    For example, scientists in a study published in *Obstetrics & Gynecology*, August 2010, found that the complication rate was so high that the clinical trial was halted early.

98.    Defendants have concealed and suppressed material information, including limited clinical testing, that would reveal that the Product had a higher risk of adverse effects in addition to and exceeding those associated with alternative procedures and available devices. Instead, Defendants have misrepresented the safety and efficacy of the Product.

99.    Upon information and belief, Defendants' misrepresentations are designed to induce physicians and Plaintiff to prescribe, dispense, recommend, and/or purchase the Product, as the case may be. Plaintiff and the medical community have relied on Defendants' representations.

100.    Defendants took unconscionable advantage of their dominant position of knowledge with regard to Plaintiff and her medical providers and engaged in constructive fraud in their relationship with Plaintiff and her medical providers. Plaintiff reasonably relied on Defendants' representations.

101.    As a proximate result of the Defendants' conduct, Plaintiff has been injured, often catastrophically, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT V
## BREACH OF EXPRESS WARRANTY

102.   Plaintiff realleges and incorporates by reference every allegation of this First Amended Complaint as if each were set forth fully and completely herein.

103.   At all relevant and material times, Defendants manufactured, distributed, advertised, promoted, and sold the Defendants' Pelvic Mesh Product.

104.   At all relevant times, Defendants intended that the Defendants' Pelvic Mesh Product be used in the manner that Plaintiff in fact used it and Defendants expressly warranted that the product was safe and fit for use by consumers, that it was of merchantable quality, that its side effects were minimal and comparable to other pelvic mesh products, and that it was adequately tested and fit for its intended use.

105.   At all relevant times, Defendants utilized direct-to-consumer advertising to market, promote, and advertise the Product.

106.   At all relevant times, Defendants were aware that consumers, including Plaintiff, would use the Pelvic Mesh Product; which is to say that Plaintiff was a foreseeable user of the Defendants' Pelvic Mesh Product.

107.   Plaintiff and/or her implanting physicians were at all relevant times in privity with Defendants.

108.   The Defendants' Pelvic Mesh Product was expected to reach and did in fact reach consumers, including Plaintiff and her implanting physicians, without substantial change in the condition in which it was manufactured and sold by Defendants.

109.   Defendants breached various express warranties with respect to the Pelvic Mesh Product including the following particulars:

a.   Defendants represented to Plaintiff and her physicians and healthcare providers

through its labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that the Defendants' Pelvic Mesh Product was safe and fraudulently withheld and concealed information about the substantial risks of serious injury associated with using the Pelvic Mesh Product;

b. Defendants represented to Plaintiff and her physicians and healthcare providers that the Defendants' Pelvic Mesh Product was as safe, and/or safer than other alternative procedures and devices and fraudulently concealed information, which demonstrated that the Product was not safer than alternatives available on the market; and

c. Defendants represented to Plaintiff and her physicians and healthcare providers that the Defendants' Pelvic Mesh Product was more efficacious than other alternative medications and fraudulently concealed information, regarding the true efficacy of the product.

110.    In reliance upon Defendants' express warranty, Plaintiff was implanted with the Defendants' Pelvic Mesh Product as prescribed and directed, and therefore, in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

111.    At the time of making such express warranties, Defendants knew or should have known that the Defendants' Pelvic Mesh Product does not conform to these express representations because the Defendants' Pelvic Mesh Product was not safe and had numerous serious side effects, many of which Defendants did not accurately warn about, thus making the Defendants' Pelvic Mesh Product unreasonably unsafe for its intended purpose.

112.    Members of the medical community, including physicians and other healthcare professionals, as well as Plaintiff and the Public relied upon the representations and warranties of

Defendants in connection with the use recommendation, description, and/or dispensing of the Defendants' Pelvic Mesh Product.

113. Defendants breached their express warranties to Plaintiff in that the Defendants' Pelvic Mesh Product was not of merchantable quality, safe and fit for its intended uses, nor was it adequately tested.

114. As a proximate result of the Defendants' conduct, Plaintiff has been injured, often catastrophically, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VI
## BREACH OF IMPLIED WARRANTY

115. Plaintiff realleges and incorporates by reference every allegation of this First Amended Complaint as if each were set forth fully and completely herein.

116. At all relevant and material times, Defendants manufactured, distributed, advertised, promoted, and sold the Defendants' Pelvic Mesh Product.

117. At all relevant times, Defendants intended that the Defendants' Pelvic Mesh Product be implanted for the purposes and in the manner that Plaintiff or Plaintiff's implanting physicians in fact used it and Defendants impliedly warranted the product to be of merchantable quality, safe and fit for such use, and was not adequately tested.

118. Defendants were aware that consumers, including Plaintiff or Plaintiff's physicians, would implant the Defendants' Pelvic Mesh Product in the manner directed by the instructions for

use; which is to say that Plaintiff was a foreseeable user of the Defendants' Pelvic Mesh Product.

119.    Plaintiff and/or her physicians were at all relevant times in privity with Defendants.

120.    The Defendants' Pelvic Mesh Product was expected to reach and did in fact reach consumers, including Plaintiff or Plaintiff's physicians, without substantial change in the condition in which it was manufactured and sold by Defendants.

121.    Defendants breached their implied warranty to Plaintiff in that the Product was not of merchantable quality, safe and fit for intended use, or adequately tested, in violation of Common Law principles and the statutory provisions of the State of Virginia.

122.    Defendants breached various implied warranties with respect to the Defendants' Pelvic Mesh Product, including the following particulars:

a.    Defendants represented through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that the Defendants' Pelvic Mesh Product was safe and fraudulently withheld and concealed information about the substantial risks of serious injury associated with using the Pelvic Mesh Product;

b.    Defendants represented that the Defendants' Pelvic Mesh Product was safe, and/or safer than other alternative devices or procedures and fraudulently concealed information, which demonstrated that the Defendants' Pelvic Mesh Product was not as safe or safer than alternatives available on the market; and

c.    Defendants represented that the Defendants' Pelvic Mesh Product was more efficacious than alternative pelvic mesh products and procedures and fraudulently concealed information, regarding the true efficacy of the Defendants' Pelvic Mesh Product.

123.    At all relevant and material times, Defendants manufactured, distributed, advertised, promoted, and sold the Defendants' Pelvic Mesh Product.

124.    At all relevant times, Defendants intended that the Defendants' Pelvic Mesh Product be implanted for the purposes and in the manner that Plaintiff or Plaintiff's implanting physicians in fact used it and Defendants impliedly warranted the product to be of merchantable quality, safe and fit for such use, and was not adequately tested

125.    In reliance upon Defendants' implied warranty, Plaintiff used the Pelvic Mesh Product as prescribed and in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

126.    Defendants breached their implied warranty to Plaintiff in that the Defendants' Pelvic Mesh Product was not of merchantable quality, safe and fit for its intended use, or adequately tested.

127.    As a proximate result of the Defendants' conduct, Plaintiff has been injured, often catastrophically, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VII
## GROSS NEGLIGENCE

128.    Plaintiff realleges and incorporates by reference every allegation of this First Amended Complaint as if each were set forth fully and completely herein.

129.    The wrongs done by Defendants were aggravated by the kind of malice, fraud, and grossly negligent disregard for the rights of others, the public, and Plaintiff for which the law would

allow, and which Plaintiff will seek at the appropriate time under governing law for the imposition of exemplary damages, in that Defendants' conduct, including the failure to comply with applicable Federal standards: was specifically intended to cause substantial injury to Plaintiff; or when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others; or included a material representation that was false, with Defendants, knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiff. At all relevant times, Defendants utilized direct-to-consumer advertising to market, promote, and advertise the Product.

130.   Plaintiff relied on the representation and suffered injury as a proximate result of this Reliance.

131.   Plaintiff also alleges that the acts and omissions of named Defendants, whether taken singularly or in combination with others, constitute gross negligence that proximately caused the injuries to Plaintiff. In that regard, Plaintiff will seek exemplary damages in an amount that would punish Defendants for their conduct and which would deter other manufacturers from engaging in such misconduct in the future.

132.   Plaintiff therefore will seek to assert claims for exemplary.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VIII
## PUNITIVE DAMAGES

133.    Plaintiff realleges and incorporates by reference every allegation of this First Amended Complaint as if each were set forth fully and completely herein.

134.    At all times relevant hereto, Defendants sold the Product to the healthcare providers of Plaintiff in the State of Virginia and throughout the United States without doing adequate testing to ensure that the Product was reasonably safe for implantation in the female pelvic area.

135.    Defendants sold the Product to Plaintiff's health care providers and other health care providers in the State of Virginia and throughout the United States in spite of their knowledge that the Product can shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore set forth in this First Amended Complaint, thereby causing severe and debilitating injuries suffered by Plaintiff and numerous other women.

136.    At all times relevant hereto, Defendants knew or should have known that the Defendants' Pelvic Mesh Product was inherently more dangerous with respect to the risks of erosion, failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the conditions proximately related to the use of the product, as well as other severe and personal injuries which are permanent and lasting in nature.

137.    At all times material hereto, Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the Defendants' Pelvic Mesh Product.

138.    Defendants' misrepresentation included knowingly withholding material information from the medical community and the public, including Plaintiff, concerning the safety and efficacy of the Defendants' Pelvic Mesh Product.

139.    At all times material hereto, Defendants knew and recklessly disregarded the fact that the Defendants' Pelvic Mesh Product causes debilitating and potentially lethal side effects with greater frequency than safer alternative methods products and/or procedures and/or treatment.

140.   At all times material hereto, Defendants knew and recklessly disregarded the fact that the Defendants' Pelvic Mesh Product causes debilitating and potentially lethal side effects with greater frequency than safer alternative products and/or methods of treatment and recklessly failed to advise the FDA of same.

141.   At all times material hereto, Defendants intentionally misstated and misrepresented data and continue to misrepresent data so as to minimize the risk of injuries caused by the Defendants' Pelvic Mesh Product.

142.   Notwithstanding the foregoing, Defendants continue to aggressively market the Defendants' Pelvic Mesh Product to consumers, without disclosing the true risk of side effects when there were safer alternatives.

143.   Defendants knew of the Defendants' Pelvic Mesh Product defective and unreasonably dangerous nature, but continued to manufacture, produce, assemble, market, distribute, and sell the Defendants' Pelvic Mesh Product so as to maximize sales and profits at the expense of the health and safety of the Public, including Plaintiff, in conscious and/or negligent disregard of the foreseeable harm caused by the Defendants' Pelvic Mesh Product.

144.   Defendants continue to intentionally conceal and/or recklessly and/or grossly negligently fail to disclose to the public, including Plaintiff, the serious side effects of the Defendants' Pelvic Mesh Product in order to ensure continued and increased sales.

145.   Defendants' intentionally reckless and/or grossly negligent failure to disclose information deprived Plaintiff of necessary information to enable her to weigh the true risks of using the Defendants' Pelvic Mesh Product against her benefit.

146.   As a direct and proximate result of the foregoing acts and omissions, Plaintiff has required and will require health care and services, and has incurred medical, health care, incidental,

and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical care and/or hospital care and medical services.

147.    Defendants have engaged in conduct entitling Plaintiff to an award of punitive damages pursuant Common Law principles.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally and requests compensatory damages, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper as well as:

A.    All general, statutory, and compensatory damages, in excess of the amount required for federal diversity jurisdiction, and in an amount to fully compensate Plaintiff for all injuries and damages, both past and present;

B.    All special and economic damages, in excess of the amount required for federal diversity jurisdiction and in an amount to fully compensate Plaintiff for all of her injuries and damages, pain and suffering;

C.    Attorneys' fees, expenses, and costs of this action;

D.    Double or triple damages as allowed by law;

E.    Punitive and/or exemplary damages;

F.    Pre-judgment and post-judgment interest in the maximum amount allowed by land; and

G.    Such further relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated this 28th day of February, 2020.

**GLENN ROBINSON CATHEY MEMMER & SKAFF PLC**

By:    */s/ C. Kailani Memmer*

C. Kailani Memmer (VSB No. 34673)
400 Salem Avenue S.W., Suite 100
Roanoke, VA 24016
Telephone:    (540) 685-0307
Facsimile:    (540) 767-2220
Email: kmemmer@glennrob.com

**JOHNSON LAW GROUP**

*/s/ Dana Lizik*

Dana Lizik [Applying *pro hac vice*]
Texas State Bar No. 24098007
2925 Richmond Avenue, Suite 1700
Houston, Texas 77098
(713) 626-9336
(713) 583-9460 (facsimile)
Email: dlizik@johnsonlawgroup.com

***Co-Counsel for Plaintiff***